IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

**MATTHEW A. ST. JOHN**,

    Plaintiff,

    v.                                 No. 08-994 BB/LAM

**DAVID McCOLLEY** and
**THE SIX UNKNOWN OFFICERS OF THE
ALAMOGORDO DEPARTMENT OF PUBLIC SAFETY**,
each in their individual capacities,

    Defendants.

### MEMORANDUM OPINION AND ORDER

This matter comes before the Court on cross motions for summary judgment filed by Plaintiff (Doc. 37) and Defendants (Doc. 39). For the reasons set forth below, both Plaintiff's and Defendants' motions for summary judgment are GRANTED in part and DENIED in part.

### Factual and Procedural Background

This is a 42 U.S.C. § 1983 case[1] brought by Plaintiff Matthew St. John after he was escorted out of the Aviator 10 Movie Theater in Alamogordo ("Theater") and patted down. Defendants, including David McColley, are Alamogordo police officers who were dispatched to the Theater in response to a call from Theater manager Robert Zigmond. Upon arrival, Mr. Zigmond informed Officer McColley that an individual, later identified as Mr. St. John, had entered the Theater wearing a holstered handgun. Mr. Zigmond directed Officer McColley to the theater where Mr. St. John was watching a movie and requested that Officer McColley "pull him out" because Mr. St. John's firearm was "making [Mr. Zigmond's] customers upset." McColley Depo. 10:18-10:20.

---

[1] As discussed below, Plaintiff also alleges state-law claims under the New Mexico Tort Claims Act.

Officer McColley entered the crowded theater accompanied by three other Defendants and, after Mr. Zigmond pointed Mr. St. John out, asked Mr. St. John if he was carrying a firearm. Mr. St. John replied that he was, whereupon Officer McColley instructed Mr. St. John to "keep your hands where I can see them." McColley Depo. 10:18-10:20. Officer McColley told Mr. St. John that he needed to accompany Defendants out of the theater. After Mr. St. John stood up, Officer McColley removed Mr. St. John from the Theater in an escort hold,[2] securing Mr. St. John's left arm. According to Officer McColley, one of the other three Defendants may have secured Mr. St. John's right arm as he was led out of the Theater. McColley Depo. 15:10-15:13.

Once outside, Officer McColley continued to restrain Mr. St. John's left arm while Defendants removed the gun from Mr. St. John's holster, removed the gun's magazine and cleared a chambered bullet. Defendants then instructed Mr. St. John to place his hands on a nearby wall and proceeded to pat him down. No contraband or additional weapons were found on Mr. St. John and a police database check revealed that he possessed the gun lawfully.

Having taken the weapon, Officer McColley informed Mr. St. John that he could return to the movie if he left the gun in his truck. Mr. St. John agreed and led officers to his truck, where they placed the unloaded gun. Mr. St. John reloaded and recocked the weapon before leaving it in the truck and returning to the Theater for the remainder of the movie. Throughout the incident,

---

[2] One training guide for law enforcement officers describes the escort hold as a technique used to safely initiate physical contact with a subject. With one hand, the officer grips above the elbow of the subject's dominant arm and, with the other hand, grips the subject's wrist. The officer then pulls the subject's hand and wrist toward the officer's center. The officer may then move the subject by stabilizing the subject's elbow and pushing forward on the subject's forearm and wrist. Wisconsin Department of Justice Law Enforcement Standards Board, *"Defensive and Arrest Tactics: A Training Guide for Law Enforcement Officers"* (March 2007).

which Mr. St. John estimates took approximately thirty minutes, St. John Depo. 118:22, Mr. St. John was, as Officer McColley recalls, "respectful and cooperative."  McColley Depo. 16:14.

In September 2008, Mr. St. John filed suit in New Mexico state court alleging Fourth Amendment violations, violations of the New Mexico Constitution, battery, and false arrest.  He asserts his federal claims under 42 U.S.C. § 1983 and his state-law claims under the New Mexico Tort Claims Act.  Based *inter alia* on 28 U.S.C. § 1331 and 28 U.S.C. § 1441, Defendants removed this matter in October 2008.  Discovery commenced and, in May 2009, both parties filed summary-judgment motions averring that no genuine issues of material fact exist.  Mr. St. John seeks an entry of judgment in his favor on all counts.  Defendants assert both that Mr. St. John has no cognizable claims and that Defendants are protected from suit by qualified immunity.

Both motions are presently before the Court.

### Standard of Review

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  In addressing the parties' motions, the Court must "view the evidence and draw reasonable inferences therefrom in the light most favorable to the non-moving party." *Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Serv.*, 165 F.3d 1321, 1326 (10th Cir. 1999).  The party moving for summary judgment bears the burden of showing that no genuine disputes over material fact exist.  *See Adams v. American Guarantee and Liability Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000); *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (finding that the movant may satisfy his burden by "pointing out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim").  If the movant meets his burden, the nonmovant must identify evidence that would enable a trier-of-

fact to find in the nonmovant's favor. *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir. 1992). Though this case involves cross-motions for summary judgment, each motion must be considered independently. *Buell Cabinet Co. v. Sudduth,* 608 F.2d 431, 433 (10th Cir. 1979). The denial of one does not require the granting of the other. *Id.*

### Analysis

**1. St. John's Fourth Amendment Claims**

Mr. St. John asserts claims arising from the Fourth Amendment's prohibition on unreasonable searches and seizures.[3] The Fourth Amendment applies to the states through the Fourteenth Amendment's Due Process Clause, s*ee, e.g., Jones v. Hunt*, 410 F.3d 1221, 1225 (10th Cir. 2005), and provides, in part: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . . " U.S. Const. amend. IV. Mr. St. John claims that he was subjected to an unreasonable seizure when Defendants removed him from the Theater and that he was subjected to an unreasonable search when Defendants patted him down. In response, Defendants claim that no Fourth Amendment violation took place and, alternatively, that Mr. St. John's recovery is barred by qualified immunity.

Because Mr. St. John's Fourth Amendment claims and Defendants' responses require the Court to begin by determining whether Mr. St. John has stated a viable cause of action, the Court will do so before turning to qualified immunity.

---

3  Mr. St. John also asserts claims under the New Mexico Constitution's Fourth Amendment analog, Article II, Section 10. Because Mr. St. John does not ask that—and New Mexico law does not require—the New Mexico constitutional claims be considered separately from their federal counterparts, this Court will treat them in tandem, extending its holding on the federal claims to Mr. St. John's state-based constitutional claims. *See State v. Ochoa*, 93 P.3d 1286 (N.M. 2004) (analyzing state and federal claims of unreasonable seizure under uniform standard where litigant did not request otherwise).

*St. John's Claim for Unreasonable Seizure*

Mr. St. John contends that Defendants unreasonably seized him by "grabbing his arms and escorting him out of the movie theater." (Doc. 1, Exhibit 1 at ¶ 21). A seizure under the Fourth Amendment occurs when "a reasonable person would have believed that he was not free to leave." *Michigan v. Chesternut,* 486 U.S. 567, 573 (1988) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (opinion of Stewart, J.)). In determining whether a person has been seized, this Court employs the factors set forth by the Tenth Circuit in *United States v. Hill,* 199 F.3d 1143 (10th Cir. 1999). Those factors, which are non-exclusive, s*ee, e.g., United States v. Griffin,* 7 F.3d 1512, 1518 (10th Cir. 1993), require the Court to consider:

> 1) the threatening presence of several officers; 2) the brandishing of a weapon by an officer; 3) some physical touching by an officer; 4) use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory; 5) prolonged retention of a person's personal effects . . .; 6) a request to accompany the officer to the station; 7) interaction in a nonpublic place or a small, enclosed place; 8) and absence of other members of the public.

*Fuerschbach v. Southwest Airlines Co.*, 439 F.3d 1197, 1203 (10th Cir. 2006) (citing *Hill,* 199 F.3d at 1147-8). While no one *Hill* factor is dispositive, s*ee, e.g., United States v. Glass,* 128 F.3d 1398, 1406 (10th Cir. 1997), we begin with *Hill* in assessing whether a seizure has taken place. As part of our assessment, we consider the totality of circumstances, but remain aware that the strong presence of two or three factors may sufficiently demonstrate that a seizure has occurred. *United States v. Shareef,* 100 F.3d 1491, 1505 (10th Cir. 1996)*; Jones,* 410 F.3d at 1226.

Applying the *Hill* factors, it is evident that Mr. St. John was seized. While watching a movie, Mr. St. John was approached by four armed officers who instructed him to stand up and

accompany them out of the Theater.  When Mr. St. John rose, Defendants restrained his arm(s) and led him outside, away from the crowd, where they continued to restrain him until they had removed his lawfully possessed weapon.  At his deposition, Officer McColley testified that, had Mr. St. John asked Defendants to release him, he "wouldn't [have felt] safe letting [Mr. St. John] go at that point."[4]  McColley Depo. 13:21-13:32.  While outside, Defendants removed Mr. St. John's wallet and handgun.  They ran a check on the latter and only returned it at the end of their encounter.  Because, from the time that Defendants approached Mr. St. John to the time when they physically released him, Mr. St. John reasonably believed that he was not free to leave, a seizure occurred.

But the inquiry does not end there.  The Fourth Amendment does not protect individuals from all seizures—only unreasonable seizures.  *See, e.g., United States v. Sharpe*, 470 U.S. 675, 682 (1985).  Under the Fourth Amendment, seizures such as Mr. St. John's, termed investigatory detentions, are reasonable if they are (1) justified at their inception and (2) reasonably related in scope to the circumstances which justified the interference in the first place.  *U.S. v. DeJear*, 552 F.3d 1196, 1200 (10th Cir. 2009) (quoting *United States v. Johnson,* 364 F.3d 1185, 1189 (10th Cir. 2004)).  An investigatory detention is "justified at its inception" if "the specific and articulable facts and rational inferences drawn from those facts give rise to a reasonable suspicion a person has or is committing a crime," *id.* (quoting *United States v. Werking,* 915 F.2d 1404, 1407 (10th Cir. 1990)), or where officers have a reasonable suspicion that a crime may be afoot. *Id. See also, e.g., Oliver v. Woods,* 209 F.3d 1179, 1186 (10th Cir. 2000); *United States v. Sokolow*, 490 U.S. 1, 7 (1989).  "[I]nchoate suspicions and unparticularized hunches" are

---

4 Though Officer McColley's *post-hoc* acknowledgment that he would not have released Mr. St. John does not factor directly into the Court's consideration, it is included here as indicative of the tenor of Defendants' encounter with Mr. St. John.

insufficient bases for a reasonable seizure. *United States v. Lyons,* 510 F.3d 1225, 1237 (10th Cir. 2007).

The undisputed facts establish that Mr. St. John's seizure was unreasonable. Defendants lacked a justifiable suspicion that Mr. St. John had committed a crime, was committing a crime or was about to commit a crime. Indeed, Officer McColley conceded that he did not observe Mr. St. John committing any crimes and that he arrived at the theater with the suspicion that Mr. St. John was merely "showing a gun", McColley Depo. 14:4, which is not illegal in the State of New Mexico. *See* N.M. Stat. § 30-7 *et seq.* Nor was there any reason to believe that a crime was afoot. When they found him, Mr. St. John was peacefully sitting through the previews for his second movie of the day. Officers had no reason to believe that Mr. St. John had been, was, or would be involved in any criminal activity whatsoever.[5] Candidly, as the Ninth Circuit noted in a somewhat similar case, one would expect someone engaged in shady business to act in a more stealthy fashion than Mr. St. John did here. *See Duran v. City of Douglas, Arizona*, 904 F.2d 1372, 1377 (9th Cir. 1989).

Moreover, Mr. St. John's lawful possession of a loaded firearm in a crowded place could not, by itself, create a reasonable suspicion sufficient to justify an investigatory detention. For example, in *United States v. Ubiles,* 224 F.3d 213 (3rd Cir. 2000), the Third Circuit found that an individual's lawful possession of a firearm in a crowded place did not justify a search or seizure. In *Ubiles*, officers seized Ubiles during a crowded celebration after they received a tip that he was carrying a gun. *Id.* at 214. Officers did so even though no applicable law prohibited Ubiles

---

5  Defendants contend that Mr. St. John was about to commit a crime because, had he refused to comply with their request that he leave the premises, he would have been trespassing. If accepted, this argument would significantly erode Fourth Amendment protections. Because the Court finds no jurisprudential support for Defendants' novel contention, no further discussion of it is necessary.

from carrying a firearm during the celebration. *Id.* at 218. Holding that the search violated Ubiles' Fourth Amendment rights, the court noted that the situation was no different than if the informant had told officers "that Ubiles possessed a wallet . . . and the authorities had stopped him for that reason." *Id.* Nor, the court continued, could the officers rely on the fact that Ubiles possessed the weapon while in a crowd. *Id.* at 219. "[Otherwise], citizens farming under the open skies of Washington or Vermont would generally have greater Fourth Amendment protections than their compatriots bustling to work in Manhattan or Boston. As a general proposition of constitutional law, this cannot be so . . . . " *Id.*

The Tenth Circuit has also dealt with this question. In *United States v. King*, 990 F.2d 1552 (10th Cir. 1993) the Tenth Circuit found that an investigatory detention initiated by an officer after he discovered that the defendant lawfully possessed a loaded firearm lacked sufficient basis because the firearm alone did not create a reasonable suspicion of criminal activity. In *King*, an Albuquerque police officer seized and searched King when, concerned that King's honking would cause an accident, he approached King's vehicle and observed a loaded firearm under King's thigh. *Id.* at 155. Recognizing that King was allowed to carry a loaded, concealed firearm in his vehicle under New Mexico law, the court explained that—in light of the legality of King's actions—permitting such detentions would render the Fourth Amendment functionally meaningless:

> In a state such as New Mexico, which permits persons to lawfully carry firearms, the government's argument [that the officer's investigatory detention of defendant was justified by concern for his safety and the safety of bystanders] would effectively eliminate Fourth Amendment protections for lawfully armed persons. Moreover, the government's "reasonableness" standard would render toothless the additional requirement that the scope and duration of detention be carefully tailored to its underlying justification. For example, if a police officer's safety could justify the detention of an otherwise lawfully

      armed person, the detention could last indefinitely because a lawfully armed person would perpetually present a threat to the safety of the officer.

*King*, 990 F.2d at 1559 (internal citations and quotations omitted).

      Defendants nonetheless seek to rely on *King* in asserting that, if Mr. St. John's seizure was not justified by reasonable suspicion, it was at least permissable as part of Defendants' performance of their role as community caretakers. Under the community caretaker exception, officers may seize an individual in order to "ensure the safety of the public and/or the individual." *Id.* at 1560. Such stops are permissible when "articulable facts indicate the need to assure the safety of the public or the individual being detained." *U.S. v. Luginbyhl,* 321 Fed.Appx. 780, 783 (10th Cir. April 16, 2009) (unpublished); *King,* 990 F.2d at 1560.

      Defendants' reliance on *King* is misplaced. Though the *King* court ultimately found that King's detention was non-investigatory and could, thus, be justified under the officer's community caretaker function while he advised King of the hazardous conditions that his honking created, the *King* rationale does not apply here because Defendants had no legitimate reason to engage Mr. St. John in the first place. *Id.* ("In short, while the safety of police officers is no doubt an important government interest, it can only justify a Fourth Amendment intrusion into a person's liberty *so long as the officer is entitled to make a forcible stop*.") (emphasis added)).

      More broadly, Defendants' actions are not protected by the community caretaker exception because they had no basis for believing that anyone's safety was at risk. Defendants simply received a report that an individual was carrying a firearm in a location where individuals could lawfully carry firearms. They received no indication that Mr. St. John was behaving suspiciously or in a threatening manner. When Defendants arrived, they found Mr. St. John

sitting peaceably in the Theater preparing to watch a movie. They had no basis for believing that Mr. St. John's use of the weapon was likely to become criminal, cause a public disturbance or pose a threat to safety. Nor did anyone seem particularly alarmed by Mr. St. John's weapon. Indeed, the record does not reveal that anyone—including the lone customer who spoke to Officer McColley about Mr. St. John's gun—was even concerned enough to have left the Theater as a result.

In sum, Defendants had no reason for seizing Mr. St. John other than the fact that he was lawfully carrying a weapon in a public place. Because New Mexico law allows individuals to openly carry weapons in public—and Mr. St. John had done nothing to arouse suspicion, create tumult or endanger anyone's well-being—there were no articulable facts to indicate either criminal activity or a threat to safety. Accordingly, Defendants' seizure of Mr. St. John violated his Fourth Amendment rights.

### *St. John's Claim for Unreasonable Search*

If, during the course of a valid investigatory detention, an officer has an articulable and reasonable suspicion that a suspect is armed and dangerous, the officer may conduct a limited protective search. *U.S. v. Davis*, 94 F.3d 1465, 1468 (10th Cir. 1996). Such a search must be "reasonably related in scope to the circumstances which justified the interference in the first place," *Terry v. Ohio,* 392 U.S. 1, 20 (1968), and should be limited to ensuring that the suspect is unarmed. *King*, 990 F.2d at 1558 (citing *Sibron v. New York*, 392 U.S. 40 (1968)).

As discussed above, Defendants' detention of Mr. St. John was not a "valid investigatory detention." Defendants had no reason to suspect that Mr. St. John was involved in, or was about to become involved in, any criminal activity. Nor did they have any reason to believe that Mr. St. John posed a safety threat. Accordingly, Defendants' search of Mr. St. John was invalid.

Additionally, Defendants lacked any reasonable suspicion for believing that Mr. St. John was armed *and dangerous*, as required by Tenth Circuit jurisprudence. *See Davis,* 94 F.3d at 1468. Defendants ask the Court to ignore the conjunctive phrasing of the rule and find, in essence, that anyone who is armed is, by virtue of that fact, dangerous. In light of the extensive, controlling and compelling jurisprudence to the contrary, the Court declines to do so.

### *Qualified Immunity*

Defendants next assert that qualified immunity shields them from Mr. St. John's Fourth Amendment claims. Qualified immunity protects government officials from civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

Courts generally follow a two-step procedure in considering qualified immunity defenses. First, they determine whether the plaintiff's allegations, if accepted as true, adequately allege a violation of a federal constitutional or statutory right. *See Albright v. Rodriguez*, 51 F.3d 1531, 1534-5 (10th Cir. 1995). If the plaintiff's allegations are sufficient, courts then consider whether, at the time of occurrence, the right was clearly established. *Id.* For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. *Hope v. Pelzer,* 536 U.S. 730, 739 (2002). This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful. *Id.; Malley v. Briggs*, 475 U.S. 335, 341 (1986). Rather, the unlawfulness of the official's conduct must only be apparent in light of pre-existing law. *Id.* Under Tenth Circuit precedent, a plaintiff must generally show that there was a Supreme Court or Tenth Circuit opinion on point or that the proposition is supported by the weight of authority from other courts. *Armijo v. Wagon Mound Pub. Schs.,* 159 F.3d 1253, 1260 (10th Cir.

1998).  If the plaintiff fails to show that a defendant's actions violated a clearly established right, he cannot recover.  *Id.*

As discussed above, Mr. St. John was seized and searched in violation of his Fourth Amendment rights.  The question then becomes whether, at the time of the incident, Mr. St. John's rights were clearly established.  The Court finds that they were.

Relying on well-defined Supreme Court precedent, the Tenth Circuit and its sister courts have consistently held that officers may not seize or search an individual without a specific, legitimate reason.  *See Terry*, 392 U.S. at 21; *Fuerschbach,* 439 F.3d at 1204-6 (holding that a seizure without a reasonable suspicion of criminal activity "would violate the most minimal Fourth Amendment standard"); *Jones v. Hunt*, 410 F.3d at 1228 ("Where no legitimate basis exists for detaining [an individual], a seizure is plainly unreasonable."); *Duran,* 904 F.2d at 1378 ("If there is one irreducible minimum in our Fourth Amendment jurisprudence, it is that a police officer may not detain an individual simply on the basis of suspicion in the air.  No matter how peculiar, abrasive, unruly or distasteful a person's conduct may be, it cannot justify a police stop unless it suggests that some specific crime has been, or is about to be, committed or that there is an imminent danger to persons or property."); *see also* Lawrence Rosenthal, *Second Amendment Plumbing after Heller: Standards of Scrutiny, Incorporation, Well-Regulated Militias, and Criminal Street Gangs*, 41 Urb. Law. 1, 37 (2009) ("When applicable law does not ban carrying a firearm, however, the Fourth Amendment does not permit a stop-and-frisk regardless of any indication that a suspect is armed or potentially dangerous because there is no indication that the suspect is violating the law."). For example, in *Sorrel v. McGuigan,* 38 Fed.Appx. 970, 973 (4th Cir. 2002) (unpublished) the Fourth Circuit denied qualified immunity to an officer who seized an individual for lawfully carrying weapon.  Noting that a state statute made the plaintiff's

concealed carrying of the weapon legal, the court found that, though "[q]ualified immunity protects law enforcement officers from bad guesses in gray areas," the fact that the plaintiff's actions were clearly permissible under the statute meant that the officer "was not in a gray area." *Id.* at 974.

The applicable law was equally clear in this case. Nothing in New Mexico law prohibited Mr. St. John from openly carrying a firearm in the Theater. *See* N.M. Stat. § 30-7 *et seq.* Because both New Mexico law and the Fourth Amendment prohibition on unjustified seizure were clearly established, and a reasonable officer is presumed to know clearly established law, *see, e.g., Harlow*, 457 U.S. at 818-9, qualified immunity does not protect Defendants. Accordingly, Mr. St. John's motion for summary judgment is granted with regard to his Fourth Amendment and New Mexico constitutional claims. Defendants' motion for summary judgment is denied with regard to the same and with regard to qualified immunity.

**2. St. John's Battery Claim**

New Mexico law does not clearly define the elements of tortious battery. Indeed, the committee that drafted the New Mexico Uniform Civil Jury Instructions noted this uncertainty in declining to issue uniform instructions for such claims. UJI 13-1624, NMRA Civ. ("The committee spent much time over a period of several months studying the matter of intentional torts . . . . It was finally concluded that there was insufficient New Mexico law on assault and battery to guide the committee on this subject . . . ."). Grappling with this issue, some New Mexico courts have applied the elements of criminal battery to tort claims. *See New Mexico v. Ortega,* 827 P.2d 152, 155 (N.M. Ct. App. 1992) ("[T]he elements of civil and criminal assault and battery are essentially identical.") This Court has, at times, done the same. *See, e.g., Garcia*

13

*v. Jaramillo* 2006 WL 4079681, 8 (D.N.M. 11/27/06) ("N.M. Stat. § 30-3-4 [i.e. the criminal battery statute] sets forth the elements of the tort of battery.").

More recently, New Mexico courts and the Tenth Circuit have begun relying on elements more in line with the Restatement (Second) of Torts. *See* Restatement (Second) of Torts §§ 18-19 (1965). Under this approach, "[a] battery occurs when an individual acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of contact and . . . an offensive contact with the person of the other directly or indirectly results." *Fuerschbach*, 439 F.3d at 1209 (citing *State v. Ortega,* 827 P.2d 152, 155-56 (N.M. Ct. App. 1992)); *Selmeczki v. N.M. Dep't of Corrections*, 129 P.3d 158, 167 (N.M. Ct. App. 2006) ("It is black-letter law that causing an offensive touching, even indirectly to another's clothing and not resulting in injury, is the tort of battery."); *ee generally* Restatement (Second) Torts at § 18. "Any bodily contact is offensive if it offends a reasonable sense of personal dignity." *Fuerschbach*, 439 F.3d at 1209 (quoting Restatement (Second) Torts at § 19).

Defendants' contact with Mr. St. John involved restraining at least one of his arms while leading him out of a crowded theater, restraining the same arm once outside and patting him down. Defendants did not handcuff Mr. St. John and did not perform more than a cursory pat down. Mr. St. John provided deposition testimony that his left shoulder was sore and that the escort hold was "uncomfortable". St. John Depo at 103:19-104:14.

Whether Defendants' actions would be offensive to a reasonable sense of personal dignity, and would thus constitute battery, is a question best left to a jury. Simply stated, a reasonable person—working with the limited factual record before the Court—may, but would not necessarily, find Defendants' contact offensive to their sense of personal dignity. Additionally, a jury must determine whether Defendants are protected by having acted reasonably

and in good faith. *See Mead v. O'Connor*, 344 P.2d 478, 479-80 (N.M. 1959) ("Officers, within reasonable limits, are the judges of the force necessary to enable them to make arrests or to preserve the peace. . . . However, it devolves upon the jury, under the evidence in the case and proper instructions of the court, to resolve these questions."). Mr. St. John's battery claim is thus not appropriate for disposition on summary judgment because viewing the evidence in the light most favorable to the nonmovant necessitates denial of both Mr. St. John's and Defendants' motions.

### 3. St. John's False Arrest Claim

False arrest involves the unlawful arrest of a person. *Butler ex rel. Butler v. Rio Rancho Pub. Sch. Bd. of Educ.*, 245 F.Supp.2d 1203, 1211 (D.N.M. 2002). Without an arrest, there can be no viable claim for false arrest. *See Johnson v. Weast*, 943 P.2d 117, 121 (N.M. App. 1997) ("We are not aware of any Section 1983 false arrest case in which the defendant did not actually arrest the plaintiff . . . ."). *See generally* Am. Jur. *False Imprisonment* § 3 ("Absent an arrest, there can be no false arrest."). Mr. St. John makes no allegation that he was arrested—either formally or as part of a *de facto* arrest. *See*, *e.g.,* Doc. 1, Exhibit 1 at ¶¶ 26-30. The undisputed facts indicate that he was not arrested. Accordingly, Mr. St. John's claim for false arrest fails as a matter of law and Defendants' motion for summary judgment is granted with regard to that claim.

### Conclusion

Mr. St. John's motion for summary judgment is granted with regard to liability on Plaintiff's claims under the Fourth Amendment and New Mexico Constitution. Mr. St. John's motion for summary judgment is denied with regard to his battery and false arrest claims.

Defendants' motion for summary judgment is granted with regard to Mr. St. John's false arrest claim, but is denied with regard to Mr. St. John's Fourth Amendment, New Mexico

constitutional, and battery claims. Defendants' motion for summary judgment is also denied with regard to qualified immunity.

## ORDER

A Memorandum Opinion having been entered this date, it is hereby ORDERED that the motion for summary judgment filed by Plaintiff (Doc. 37) be, and hereby is, GRANTED in part and DENIED in part. It is further ORDERED that the motion for summary judgment filed by Defendants (Doc. 39) be, and hereby is, GRANTED in part and DENIED in part.

Dated this 8th day of September, 2009.

_____
BRUCE D. BLACK
UNITED STATES DISTRICT JUDGE